And we'll begin with Mr. Byrd. Thank you, Your Honor. May it please the Court, my name is Tucker Byrd, and I represent Mr. and Mrs. Wright and their company, Destin Development. We, in my limited time, let me start out by expressing my appreciation to the Court for lifting up the case of Trevino v. City of Fort Worth because it serves as a great example of why the Wright defendants' claims, which dramatically differ from the Trevino case, should not have been dismissed for at least seven reasons, if I may let me go through them. First of all, considering the posture of Trevino, Trevino was a motion dismissed, obviously an adversarial step which required a defense. In this case, the Wrights and Destin, it was a PTO 65, was essentially a Lone Pine type order. I call it almost Lone Pine light. It was more informational. The primary purpose of which was designed to facilitate the neutrals process, which, by the way, my clients had already been through. If it were comparable to anything, it would be comparable to almost a Rule 26 type disclosure. Secondly, in Trevino, the action was initiated by the defense. In this case, in our cases, the defense was uninvolved. Third, a motion to dismiss, a Rule 12 motion, is a very standard procedure. Everybody knows how that works. In this case, this was obviously a special procedure. Well, it seems to me the order was designed to move the case forward. I mean, these were elements of your claim that applied to your claim specifically, to the B-1 claims, and he wanted to know what he wanted to flesh out the cases that had the elements and those that didn't. Absolutely, and for five years my client had done what it thought was everything possible to move the case along. They were individual cases. They filed the short-form claim. Obviously, this last misstep is where the problem lies. It was definitely a special type procedure, not the kind in Trevino, which was, look, it's a Rule 12. You have to be prepared to defend yourself. In Trevino, clearly there is a prejudice to the defense if the plaintiff doesn't respond. In Trevino, the defendant should not have been required to litigate at the lowest common denominator. In other words, the case should not have been dumbed down because one side didn't comply with the process. Here, by comparison, there's no prejudice to the defendants. In fact, the prejudice is as much to the plaintiff as anyone who benefits by the further elaboration of his claim. Fifth, Trevino was clearly a merits outcome contemplated step. That wasn't the case with respect to PTO 65. Similarly, in Trevino, Step 6, it was potentially dispositive. If I had to describe anything about PTO 65, it was facilitative. That makes it qualitatively different from what happened in the Trevino case. And I understand that Judge Barbier said it was imperative to respond to his orders. Quite frankly, I think any court's order is imperative to respond to it. Unlike some of his prior orders, he gave a very express warning. If you don't respond, your case could be dismissed with prejudice. And finally, with respect to Trevino, and the court made note of this, is that the plaintiff in Trevino, the case was not listed on an active case list. That's a stark contrast with this case, which had been actively litigated for years. And quite frankly, as we laid out in the papers, we were waiting for the mission orders from the court to try our case. When you became counsel, did you look at the docket, the individual docket? We did. That's where we focused our attention, on the individual docket. Did you see PTO 12 in your individual docket? There's no question we saw it. We would have looked at it, PTO. And I understand the argument of BP, which is if you look at 12, and it links you back to 1. And the whole concept is that theoretically, something could come out that could impact your case. But 12 requires the signing up, the attorney to sign up for ECF. Absolutely. But you or your client didn't do that. We did not do that. Isn't that exactly what happened in Trevino? Well, if the question is, was a rule followed? Yeah, there's a similarity between the cases there. Oh, I'm sorry. I mean it even more specifically than that. I mean, it's a rule about signing up for ECF notices. Well, that's one of the problems, that and the fact that their e-mail did not go through. There's no question that, and we're not sitting here to say, look, we did not file with the LISTSERV. If we had filed with the LISTSERV, if it finalizes, Your Honor, to anything, it's almost like a causation standard in tort. But for failing to file with LISTSERV, would we have gotten PTO 65? The answer is yes, we would have. No question about it. What we would have done with PTO 65, well, know what we know now. We know what it means. It is a little bit complicated, what the order is. But assume for the sake of argument that but for failing to file with LISTSERV, we would have got PTO 65. You heard the expression woulda, coulda, shoulda. Well, certainly if we'd filed with LISTSERV, we would have and could have gotten the direction to PTO 65. So really only the question is why you didn't, and it's literally, you don't even have to go to a different docket. You just have to go to the same one. Did you enter a notice of appearance in this individual docket? Yes. So the same docket where you enter the notice of appearance has PTO 12 in it. Correct, and it does. So the question is, now here's the should've. Well, it's analogous to almost like legal proximate causation, foreseeable causation. Was it reasonable to anticipate where we were in the case? Literally, we've been through the neutrous process. We're ready for it to be freed from the morass of the MDL to try our case individually. Is it reasonable to assume that an order could come out that could drag us back into the morass of the MDL to go back through a neutrous process? My argument would be that's a tougher question. Well, is it the real question, is it reasonable to assume that you would comply with the PTO? Because if you comply with the PTO, I think you just told us, obviously, you would have gotten all the notices. None of this would have mattered. Right, but for failing to listen, we would have gotten PTO. We would have read it, and we would have acted. We think appropriately. But that's just obviously sort of part of the analysis, and that's why when you get into the excusable part of the mistake, whatever you want to call it, misstep, breakdown, it almost doesn't matter. That's why the equities weigh into this so heavily. You did respond to the sure cause order, did you not? Well, we did, absolutely. And what we tried to say was, Your Honor, my gosh, we respect court's orders implicitly. This was a simple mistake. And the proof of the pudding was we responded just like the court said we would. But you actually didn't even get that. You only got it because the former counsel saw it and contacted you all. Well, and that's consistent with because we didn't get PTO 65. So you'd be park national but for that guy or gal paying attention. Well, I don't really look at it like that, but I understand the point. So then the question is, if you look at it now, where we were in the case, which is, okay, we didn't respond to a directive to file information which would facilitate the neutrals process. It seems like you're moving on and your time is up. Oh, I'm sorry, Your Honor. I know that's hard. You get very into your argument and you don't see the red light, but I do. I appreciate it. Thank you. You did say time for rebuttal, though. Yes. Good morning, Your Honor. My name is Mark Tobolsky. I represent the park national appellants. I'd like to take a step back first and look at the legal framework with which this court should review the dismissal here. And it is our position that the dismissal here should be reviewed under the standard of a sanction for failing to comply with a discovery order. Judge Davis, as you pointed out, the court asked to provide information. As the order itself says, it's to facilitate a neutrals process, a neutrals process my client had gone through and provided a report that described the theory and facts for causation and described the theory and facts for damages and was supported with over 1,700 pages of supporting documentation. That includes tax returns, financial statements. The BP says this was a long time ago and this is an update and that was the purpose. Sometimes you get too much information and you need to have it condensed down, too. Sure. And the report that I refer to that had been previously submitted was about seven pages, a little longer than what we had here, but that's about the length of that report. Judge Haynes, to your question, we were differently situated. Not all claimants had gone through the neutrals process. This court is well familiar with the massive number of claims and that lots of claimants weren't really participating. That wasn't park national here. Park national had filed its own individual complaint before a court had even ordered it to do so, had participated extensively in the neutrals process, and was unsuccessful in resolving their claim there, and here just missed PTO 65. Do you think that PTO 65 is meaningly different from PTO 64, which is the one that we dealt with in the Cepeda case? So as to my client, yes, because 64 didn't result, for certain claimants, did not result in dismissal by failing to respond to it. In fact, as to my client, 64 did not lead to dismissal. So there's some differences between 64 and 65 because it's about sorting out certain claims. But as to the Cepeda plaintiffs, it obviously did result in dismissal. As to Cepeda? The ones that were at issue in our Cepeda case, it involves PTO 64, and we look at the PTO and we say this looks like a docket management order, not a discovery order, so we're going to apply the standards we applied to docket management. And so what I'm struggling with is why we wouldn't do the exact same thing and say the docket management standard applies to PTO 65. You mean why the discovery standard applies? No, no. So in Cepeda, we applied the docket management standard to PTO 64, and I'm wondering why we wouldn't do the exact same thing and apply the docket management standard to PTO 65. Your Honor, I don't think PTO 64 has the same kind of what I would call discovery-type aspects to it. And I think you have to look at the substance of the orders. And 65 says we're going to give you four questions. Three of them are essentially describe your causation theory, describe your damages theory, and the fourth question is do you have experts? Yes, no. I mean, those are right in line with the Rule 26A disclosure or what I would call a standard discovery interrogatory. And if we treat it as a discovery order, then reversal is, frankly, on this record, unavoidable, because under the discovery standard, the misconduct or the failure of the spot has to be attributable to the client, not the error of counsel. And there's no evidence in this record that the client, Park National, was responsible for the missed response. The record here, Mr. Bowden, trial counsel, acknowledged that he received the order and just missed its impact. But, Your Honor, even under the – so I think that if we go that route, it's a fairly simple resolution to a reversal. If, however, we – like Cepeda, you treat it as a docket management order, reversal is still required here. Even under that standard, the Rule 41B standard, that this Court has followed in Barrera, Graham, Cepeda, Perez,  first, a clear record of contumacious conduct or delay, and, two, that a lesser sanction would not be adequate. Those findings appear nowhere in this record, and there's no facts to support that record. Here, the Court simply said you failed to respond, you're dismissed with prejudice. Well, they did a little bit more than that, right? The district court said respond or it will be dismissed with prejudice. Sure. And I understand the claimant's argument here is, well, the district court can't say respond or you will be dismissed with prejudice? Is that basically the idea? Because the district court told you, right, it was assuming you had seen it, right, you would know that the consequences of failing to respond would be a dismissal with prejudice. It says it right there in the notice. It does, but that doesn't overrule the Rule 41B standard that this Court said in Graham and Barrera applies. Even in Graham and Barrera, in all – in both those cases, there was a notice somewhere, fair to comply will result in dismissal or may result in dismissal. And in those cases, how did the Court review it? They still went through and said, is there a clear record of contumacious conduct or delay? And two, is there – would lesser sanctions not suffice? You have to do the same analysis here. The district court didn't. What is the lesser sanction you would advocate? You know, I think there's – there would be a few to choose from. I think one fair, reasonable sanction here would be like, okay, you're off the hook this time. Next time, you don't get any more warnings. If you fail to comply with an order in the future – How is that a sanction? A sanction? Because basically it would say, you know, here you get this – See, we'll give you a pass. No. I don't know. I was a trial judge for eight years. I don't remember ever sanctioning anyone by giving them a pass. I apologize. I wasn't clear, I guess. I'm not saying that it wasn't – the sanction is getting a pass. The sanction is, in the future, you don't get – if you fail to comply with any order in the future, we're not going to go through a show cause order or anything. You're just out. That could have been it. It could have been a financial sanction. But here, there's an issue, which is there's no prejudice to anyone by having allowed this – You've got an MDL case going, hundreds, thousands of cases, and I think the cases say that you cut the trial judge a little more slack on getting rid of those cases if they don't respond to orders. Your Honor, the court certainly has recognized that there's a special deference in the MDL context, to be sure. But that doesn't mean that the other law of the circuit, which says that when you're looking at sanctions of dismissal with prejudice, that the discretion is limited and that the stringent tests apply. And here, imagine we had complied. The question is, have we materially affected the progress or resolution of the MDL as a whole? The problem is, yes. To some extent, yes. This event that began the process occurred in 2010, I believe. It occurred almost 10 years ago. BP settled the case many years ago, presumably to avoid spending the rest of their life paying lawyers to show up in the Fifth Circuit and the district court and all these other places forever. And here we are. We are still getting BP appeals years and years after this alleged settlement. I think that is, I mean, I presume they're paying their lawyers and they're having to deal with this. So, yes, while it may not be prejudice in the sense of some major, huge blow, it's still prejudice when a defendant has to keep on keeping on and keeping on, particularly when they have settled the case. I'm not taken away from the original disaster that led to this, so I'm not trying to underplay that. I'm just saying here we are. So I think the notion that this is meaningless is inaccurate. My time has expired. May I briefly respond? Please respond. Your Honor, let's imagine the counterfactual. Let's say we'd timely submitted our PTO 65 statement. Where's that group of plaintiffs today? The case is still status to them. There's been no dispositive motion practice. People aren't being sent back for trial. The only thing that has occurred is earlier in 2019, after this appeal was taken, PTO 67 was issued. It's at docket number 25370 in the district court. To be fair, not part of the record here. It was after the appeal. And it said, okay, for everyone who complied with 65, now we want you to produce the documents to substantiate your damages and causation theory. Again, something we had done years earlier. And then it set up, then ordered, okay, we're going to produce these documents. There's going to be mediation. You're essentially kind of bringing the remaining group down. You're trying to get to figuring out what to do with who remains, the people that have not been addressed for whatever reason, have not finished their case, have not accepted whatever the settlement is, if not whatever. And it's allowing, you know, you don't know what analysis BP might be making or the various entities might be making of this material. We just know you didn't give that material in a timely fashion. You did this five years ago, but the notion here was to update it and refine it, as Judge Davis said. Well, I can only say in the case of Park National, and our submission is in the record of what the materials were, there wasn't anything to update. We had gone, we had done a full workup of our damages years earlier. In our case, there wasn't anything to refine. I mean, it was all past damages. There was nothing new to bring to bear. All right, well, your time's up. I know I kept you longer than your time. Thank you, Your Honor. Both of you all have time for rebuttal, and we'll now hear from Mr. Hicks.  Well, y'all already paid billions, so who cares? That's their essential argument. So why should you care if they missed the deadline? Well, I think that, Your Honor, I think that question is going to the question of whether there is prejudice here for the failure to not comply with both PTO 65 and with the subsequent show cause order. And I think this court has already addressed that question in Barrera and Graham, where it said that noncompliance with Judge Barbier's PTOs, quote, delays the district court's efforts to adjudicate the MDL expeditiously, end quote. And the result of that is, just as you said, that every time that Judge Barbier has to deal with noncompliant plaintiffs or shoehorn somebody back into the process, the more time he has to spend on disobedient parties, the less time he can devote to compliant parties. And it's true that BP has to deal with that as well. I mean, it's paying you. Well, yes, yes. I mean, to be clear, yes, it costs BP lots. I don't mean to be imposing on anybody. Yes. I'm not a pro bono attorney for BP. Yes. To inject some legal realism here, yes, it costs money to handle these motions for reconsideration, to handle the appeals. I hate to break it to you, but the PTO 66 appeal is coming. It's about to finish briefing. More plaintiffs who did not comply with PTOs or the show cause order. And the reason they're doing that is because every time there's sort of a small factual distinction or the PTO 66 appellants, not these appellants I want to emphasize, analogize themselves to the D'Amico plaintiffs in Graham, which is the only time this Court has ever reinstated any of the plaintiffs. But any time there's a little bit of a hole or an exception, the next round of plaintiffs says we're just like them. So next time you've got five sets of appellants in the PTO 66 appeal, and then who knows. So there is absolutely prejudice. Again, it's not to say that we're trying to balance how much prejudice, but to say that there's no prejudice just is not accurate. And I want to start a little bit with the Destin appellants and also speaking in conjunction with the Trevino case that this Court asked the parties to address. I think it will not surprise you to hear that we think that Trevino strongly supports affirmance of both sets of appellants. I'll start with the Destin appellants because the Trevino case is very clear, as Judge Oldham pointed out, that failing to be diligent about your case, including failing to stay abreast of events, failing to sign up for electronic service when there's a specific court order, does not constitute excusable neglect under Rule 60b-1. Now, we don't even think that the Destin appellants preserved an excusable neglect argument, but if you accept that they did, number one, this Court's cases, even before Trevino, said, for example, in the Edward Boland case, that careless mistakes of counsel or misconstruing the rules of the court do not constitute excusable neglect. And that's exactly what we have with respect to the Destin appellants. They didn't register for file and serve, even though PTO 12 said you have to do that. They didn't monitor the master MDL docket or the website, which has far fewer entries than the master docket and has the important entries, like PTOs, despite the fact that PTO 1 said to do this. They didn't diligently review the individual dockets because those dockets contain about 10 entries. How much time, if you signed up and were paying attention, so if you were not Destin, you signed up, and if you were not Park National, you were paying attention, but you're one of these kind of over-in-the-silent-zone plaintiffs, how much time would you have to spend reviewing stuff in order to find things that do matter to your client? Well, I can't speak for what the plaintiffs had to do in this case, but I can say that hundreds of plaintiffs complied with PTO 65, and PTO 65 gave the longest period of any of the prior PTOs for compliance. It gave three months. And even after that, Judge Barbier issued a show cause order. Now, Destin complied with that, at least partially, with the show cause order. They just didn't comply with the original order. That's true. Park National just ignored both orders. Park National didn't do anything, and I do want to use that to talk a little bit about Park National. Before we move off Destin, just to put a pin in Judge Haynes' question, am I correct that there are ten total entries in the Destin docket? That is essentially correct because there's three Destin appellants. I think one of them has eight entries, one has 11, one has 10. So there may be a—but the answer to Judge Haynes' question as to how many of these notices are you getting to know what's really going on in your case, the answer is somewhere between eight and 11. I mean, it's very few. And if you are, in fact, diligently reviewing your individual docket, I mean, seven to eight of those entries are case assigned to so-and-so, summons issued, that sort of thing. I mean, the PTO entry, there's one entry that says here are the five PTOs, the sort of foundational PTOs that govern how the parties are supposed to move forward. That's what would tell you to sign up. It wouldn't necessarily tell you everything else you need to know about the case, right? Because you need to look at the—you need to sign—what you're signing up for is the master docket. Well, what you're signing up for is when you enter an appearance and you read PTO 1 and you read PTO 12, PTO 12 says sign up for the special file and electronic service. And when you do that, you get the entries that are relevant to you. So you would get PTO 60. So PTO 65 would not be on your individual docket, but had you signed up, you would get it. But you wouldn't get a bunch of stuff that only applies to Mr. X over here. I believe that's correct. Right. This is a—we don't even get the whole record anymore in these BP cases. We get, like, this little mini record, hopefully, that is just what this case is about because the massive record, if we were still doing paper, would probably fill this room, right? Yes. So I guess I'm trying to understand. If I were the lawyer for Destin and I had signed up, how would I know about PTO 65? How would that have come to me? I want the physics of it. I'm sitting in my office. Yes. How would I know? You would get an e-mail. Okay. An e-mail right to your e-mail address. And it wouldn't be 10 e-mails a day of everything under the sun. It would just be e-mails that might relate to my client? I believe that's correct, yes. Okay. Because you're a B1 plaintiff. So I wouldn't get the stuff for the B1 plaintiff. Yeah. You're not going to get the government. You know, there's so many things happening in this MDL, but you're going to get. That's what I'm saying because I could see that my e-mail, if it was still used to make noise in the past, if it was still beeping, that it would be beeping all day. Right. That's not the case here. That's not the case. All right. No, it goes to the specific attorneys, and that's why hundreds of attorneys dutifully complied with this. So Trevino only confirms what this court has already said in many other cases, that what happened here was not excusable neglect. Most of these cases, though, where the claimant was not warned that if you don't comply with this order, your case would be dismissed, most of the cases cut the claimant some slack on those, don't they? Well, Your Honor, I think that particularly in this situation where you've already had prior PTOs, I mean, PTO 60, 63, 64, by the time you get to PTO 65, everyone was well aware that dismissal with prejudice was on the table. I mean, and I think this court said in the Barrera case that counsel should have been aware and prepared that that might be an occurrence. Is there a previous order that would have warned failure to comply with 65 could result in dismissal? I don't think there's anything absolutely explicit in PTO 65 that says if you don't comply with this, you will be dismissed with prejudice. But it is certainly of a piece with all of the prior orders that came. I understand you need to comply with a court order. But, I mean, the cases seem to be pretty generous to the claimant when they don't receive a warning like that. Well, Your Honor, I think that, you know, many of those cases were not MDL cases, and they certainly weren't the Deepwater Horizon MDL. And, you know, I don't think actually either appellant here is even making that argument that they didn't have fair warning that dismissal with prejudice might have. So the order to show cause, surely. Well, yes, but I don't— Park National didn't respond to that. That's correct. Park National didn't fully respond. That's correct. And I don't read the Destin appellants to be making an argument that they didn't have fair warning that dismissal with prejudice might be an option. And to be clear— They do seem to make that distinction, though, don't they? I'm sorry, sir? The cases, most of the cases do seem to make that distinction. I don't know if they make the distinction in this particular context when you've got a— Well, not in the BP case, but, I mean, just generally speaking. Well, sure, generally speaking, because then you could actually contemplate that there might not be particular prejudice to the court or to the other party. But here you have a situation where Judge Barbier is admirably trying to keep the trains running on time and move things along. And in this particular case, for example— We're trying to clear the railroad, actually. I mean, this case has been going on for a very long time after what is supposed to have been a settlement. Now, I understand that the nature of the settlement isn't like when you have a car wreck and you give the other side $100,000 and you go on. It's more complicated because of the number of plaintiffs. But still, it seems to me this case is going on a very long time considering that it was supposedly settled. What year was that, like 20— 2013, I believe, is when the main economic and personal injury settlements were done. But you're right— the bulk of it was settled, and yet here we are in the dawn of a new decade still dealing with it. Well, that's correct. And Judge Barbier is doing everything he can, using the discretion that this court has afforded him and that he is afforded, to bring these claims to a resolution. For example, here, he took the PTO 65 information that was provided by compliant parties and he used and he issued PTO 67. And under the PTO 67 order, there were mediations set up and there were resolutions of many of these claims, and that process has already finished. So I think it underscores here that trying to shoehorn noncompliant plaintiffs back in in this sort of MDL actually does interfere with judicial administration, which is something that the pioneer court in the Supreme Court decision recognized, and it's something that this court has recognized is something that affects the analysis here. It affects BP. It affects the compliant plaintiffs. And so I do think it is the case that we almost take for granted what Judge Barbier has been doing for so many years, and the discretion that this court has afforded him allows these to move forward. If I can talk a little bit about the Park National appellants who did not respond to either the initial PTO 65 or the order to show cause. And they got it. I'm sorry, Your Honor? They got it. Oh, yes. They received it. They just did it. They have conceded. They got it but didn't get it. That's right. They conceded. They received both orders. The show cause order explicitly identified them by name. The PTO 65 order referred to a list that any diligent attorney I think would find as well, but there's no dispute that they received those orders and that those orders applied to them. And where I want to start here is I think because really what they have is an excusable neglect argument. Really what this case is is the same thing as in Trevino. So you've got in Trevino, you've got plaintiff, and same thing in Bolin, same thing in Bynum and Rayford, cases that we cite in our brief. You've got plaintiffs who failed to respond to an opportunity to argue against dismissal before dismissal. They failed to do so, and the only first time that they argued against dismissal was in the motion for reconsideration after dismissal. And what this court did in all those cases, including Trevino, is the court only reviewed the order denying reconsideration and used the standards applicable to orders denying reconsideration. So here you have an order to show cause. They gave plaintiffs an opportunity to explain themselves. They did not take that opportunity for whatever reason, and therefore the only time that they made arguments against dismissal was after dismissal in their motion for reconsideration. That is the only order that is properly before this court. Under Trevino, under Bolin, I mean in Trevino, the court specifically says that the plaintiffs challenge the district court's order on the motion for a new trial, their order on reconsideration, and the district court's final judgment on the motion to dismiss that they didn't respond to. But the court only then proceeds to address their Rule 59 and Rule 60 arguments on the order for reconsideration, and that's exactly what should happen here. And you apply, and that gets them at best to a manifest injustice standard. Now, we don't think that manifest injustice is even a grounds under Rule 59. Trevino doesn't include it. Many recent cases don't include it. But even if you accept that that's a basis, there certainly was no manifest injustice here and certainly not under an abuse of discretion standard. They didn't comply with two orders, including a show cause order. They concede that they received them. The show cause order identified them by name. I don't understand. So Judge Davis was correctly referencing cases where we've been generous, if you will, to the negligent party or whatever you want to call it. This case is different from most other than perhaps Trevino because Destin just didn't sign up. I mean they weren't destined to get any of this stuff because they didn't sign up. Park National did sign up, did get the order, and ignored it twice. That's kind of different from the old days when you might get a letter and your secretary got it and she put it in your inbox but something else got on top of it and so on and so forth. And so you missed it, but you otherwise were paying attention to everything else going on in the case. Am I right in that analysis? Well, I think that's correct, and I think that those are all— I think that's correct because these are all in the excusable neglect bucket. You know, you missed something, you forgot to respond to something, whether it's a motion to dismiss in Trevino and Boland, motion for summary judgment in Bynum and Rayford, here in order to show cause, all opportunities you had to respond. And you say, I'm sorry, Your Honor, I lost it, I forgot it. And what you can do is you can file a motion for reconsideration arguing under Rule 60b-1 that you had excusable neglect, and there might be a good reason for it. I mean, I think the coward case from this point— What I'm saying is in the case of Destin, they just didn't have a mailbox to receive the letters. So I don't even know—it's not really just overlooking something that was on your secretary's desk or it got stuck in some other papers from another case or in the wrong file. I'm using—because most of my law practice was in the paper days—I'm using those analogies. They just didn't sign up, and that was a knowing decision not to sign up because they supposedly reviewed the PTOs that said to do it. Then in Park National's case, they got two letters and ignored both. And so I'm saying it doesn't seem like it's directly analogous to the typical case of sort of the one mistake or the one overlook or the one got stuck on the secretary's desk. Well, you're right, Your Honor. There are multiple errors in both sets of appellants. And I think the sort of fundamental rule that governs all this is exactly what the court said in Truvino, which is that parties and their counsel have a duty to stay diligent about their case. And whether a long time ago that meant you make sure you talk to your secretary to get the right papers or now that you sign up according to court orders and you monitor the dockets and you do what orders tell you to do or you read them and you see that your name is in a show cause order and you respond to it, I think that's of a piece with that. And I think that what this court said in the Moore v. Sitko case, quote, allowing parties to avoid sanctions by not reading documents in their own case would erode court's ability to enforce their lawful edicts. It's at 735 Fed Third 318. And I think that is, of all the rules that govern what happened here, that is one of the most fundamental ones. But I also want to make clear in my remaining time that, as I've argued, we think that the only, for the Park National appellants, the only order that is reviewable here is the order denying reconsideration reviewed under the standards for that Rule 59 manifest injustice at best. But I do want to respond to this idea that there are other standards that apply. And I think the reason that Park National is making that argument is because they don't have an argument under these orders on reconsideration. But very briefly, first of all, this was not, PTO 65 was not a discovery order. It is almost substantially similar, if not materially similar,  to the point that it's really kind of a big nothing, that it hasn't advanced the ball, that there's still just kind of this group of PTO 65 people that actually complied are still just sitting there under the tree. What about that argument? With respect, that argument is completely wrong because PTO 65 required updated information. It required information that went to the courts, not to, you know, some sort of neutrals ether. It required, as Judge Davis pointed out, it required like a summary and it condensed information because, you know, giving somebody 10,000 pages of documents isn't very helpful. And all of that information was then used in conjunction with PTO 67. I mean, it hasn't just done nothing. It was used in conjunction with PTO 67, which asked for additional information and then set up a mediation process for every single one of the compliant plaintiffs. So PTO 65 did exactly what it was supposed to do. Trying to bring closure. Exactly. And it worked in conjunction with PTO 67. And that process is over. And, you know, the train has left the station and it's reached the next station and it's let some people off. And, you know, we're getting closer to the ultimate destination. The last thing I do want to say, if I may, is, you know, even if this is not a discovery order, we don't think it is, and even if you were to look at it under the record of delay, consummationist conduct, no lesser sanctions, you know, we think that certainly violating and failing to respond to an order to show cause qualifies. This Court has affirmed dismissal with prejudice. I just want to give the site very quickly. Maxey v. Citizens National Bank, 459, Fed Second 56. The Court affirmed dismissal with prejudice for failure to respond to a show cause order and that is consistent with Courts of Appeals decisions. I'll give them the Tenth Circuit, 628, Fed Appendix 617, and a First Circuit decision. Thank you, Your Honor. We have your argument. Thank you. Mr. Byrd. The railroad metaphor is actually quite apropos, because my client was sitting waiting at one gate for the train to arrive, and instead of vigilantly waiting for the trial order to come in, instead of reading the schedule board to be notified, there had been a gate change or there was some change in the— How would you have gotten the trial order? The trial order? You're diligently waiting for the trial order. We would have anticipated a trial order being sent to the individual case in which the case is to be tried. But you didn't have a notice in the individual case. Well, we were looking at the individual docket diligently. You were just refreshing it effectively. We were looking at every—constantly looking at it, waiting for it, because that was the event we were waiting for. We'd been through the process. The neutrals we had been through, which, by the way—and, again, this is going to sound like sour grapes. If we had read PTF 65 talking about facilitating the process with the neutrals, having been through that, the first question that would have come to my mind is, is this something we should be excused from? Now, granted, you would ask permission, obviously. You wouldn't just assume it doesn't apply. And in this case, I think it's also interesting to note the interplay between the individual cases and the master case. The PTOs, the responses to PTO 65 were actually required to be filed in the individual case, which, again, indicative that the individual cases were going to take on their own life, if you will. And to expand a little bit on this issue, what do you get on this, sir? We've since signed up for LISTSERV, which is somewhat of an irony. You get everything. It is a daunting, withering challenge. You look at every— Is there anything about the ray line that would tell you that this is more relevant to you than just to the world? No, you have to kind of scroll down. There's a lot of technical computer identification information on it. It's not easy. It's obviously doable. And I understand what you're dealing with as much as you're dealing with. It's the best, I would assume, that there is out there. Let me conclude by saying this. Are you saying you've gotten a bunch of emails on stuff that truly has nothing to do with you? Well, quite frankly, none of it applies to us anymore. That's the irony of this. I have to keep watching and enjoying sort of vicariously what everybody's doing. Let me say this. I've got 30 seconds. You know, the legacy of this case should not be the failing to comply with a court order, requiring the submission of information, which benefits us as much as anyone, to be quite frankly. It's not adversarial. It doesn't deprive the defendant of an opportunity to defend itself. It's not a marriage determination. It's facilitative, not dispositive. That should not justify the dismissal unless the policy of this court is going to be zero tolerance. And if that's the case, well, then this whole concept of excusable neglect, we may as well just throw it out because excusable neglect is the quintessence of equity and justice. One other point, 400,000 cases filed. You know, from above, you look at one case, it's like a grain of sand on the beach. Does it really matter? To my clients, that grain of sand is all they have. We'd ask that the permission and the directive of this court to reverse the dismissal and allow the case to proceed on the merits. Thank you. Mr. Tversky? Thank you, Your Honor. Do you want me to? Go ahead. Okay. First, I'd like to respond to a couple points. Mr. Hicks referred to this should be treated like PTO 64. PTO 64 involves substantive type issues about there are certain types of claims that were potentially barred as a matter of law as to certain claimants. It wasn't this discovery type, so I would make that point. Second, there's been questions about, you know, the notice and what you get and what you don't get. Neither PTO 65 nor the show cause order were entered on the individual dockets. Park National's document, individual docket has six entries on it. Had it shown up there, it wouldn't have been missed. Here, we got it in the flood of e-mails we get from NDL. Describe the flood to me. Yeah, and to be fair, I've relied on Mr. Bowden, who's my co-counsel here, to help fill me in because he's more involved in the district court than I am. But it's my understanding is they get everything that's filed on the master docket comes to them through e-mail. But is there any filtering by way of the ray line or anything like that? Not that I'm aware of, Your Honor. And, you know, I want to make clear. Is the term PTO something that would be a filter? In other words, that you're getting an order rather than somebody filing a motion for notice of change of address or something. Sure. I mean, if you look in the e-mail, I mean, PTO, I mean, it's an order. We're not saying that the orders would more get your attention than just everything under the sun. Sure. We don't dispute that we received the order. It was just a mistake and missed the application of 65. And we've addressed that in our briefs. With respect to Truvino, I don't think it's applicable as to the Park National case. There, there was a dispositive motion filed that went unopposed and was granted. It wasn't a sanctions case at all. It doesn't really tell us anything about the analysis in this case. And I would just end with whether you review this under the sanctions standard or even under the 5090 Manifest Injustice standard, the facts here don't support the district court's judgment dismissing with prejudice the claims of Park National. How would you write this to avoid what BP's counsel was alluding to, which is everybody tries to get out of it now if we go your way, that they're using Graham to just blow it open so that Judge Barbier really doesn't have any more authority? How would you address that? Sure. And after you made that comment, it's something I was thinking about. It seems to me that Mr. Hicks' – let me answer that in two parts. First, Mr. Hicks' argument says, well, we're prejudiced because if this court doesn't just slam the door shut on everybody who gets dismissed, people are going to keep, you know, pursuing appeals, as is their right, and you need to basically just do something to stop the appeals and basically stop giving anyone hope of ever reversing the district court. And as we've seen with at least the D'Amico appellants in Graham, there are some parties, and I believe Park National is one of them, who are entitled to relief. Now, to your specific question, how do we write that opinion, I think there's a couple ways. First, you know, most of these pretrial orders are not what I would call discovery-type orders. No, what would specifically distinguish you from the world? What would distinguish you – Like from PTO 66 or – Or from all the other cases we have, you know, Zepeda and all the other cases we have that say you do, you know, we enforce that in an MDL. What would make you different that would avoid what I'll call the Graham problem? Sure. D.P. articulated. Well – Quickly.  You're out of time. And I understand that, Your Honor, and I appreciate that. I mean, what you see in, like, Barrera and in Graham as to the appellants who was affirmed, and in Zepeda, what you see is the district court gave multiple chances, and you had parties saying, give me more time, give me more time, give me more time, and the court would do it, but then if I said enough, and there was no possible way you could say somebody wasn't aware of what was going on. They had fully participated, and then when Judge Barbier didn't give them as much as they wanted, they just ignored Judge Barbier. I understand exactly what the court did there, and I think that cuts off a lot of this. We're dealing with a small subset where I'm not familiar with another case of the ones we've discussed here where someone just came forward and said, like, look, I made a mistake and missed it. But that's what's happening in the Rule 66 appeal. Pardon? Isn't that what's happening in the Rule 66 appeal? We're going to do all of this all over again with another group of people who ignored the PTO for whatever reason. Yeah, and I have to be honest. I haven't read the briefing in the 66 appeal, so I don't want to guess as to it, but there's ways to distinguish, I believe. I appreciate that. Thank you. We appreciate all the arguments in this case. We are now concluding our oral arguments for the day, and we will be in recess until tomorrow morning. Thank you.